IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CHARLESTON DIVISION**

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
and SIERRA CLUB,

                Plaintiffs,

v.                                     CIVIL ACTION NO.  2:13-5005

CONSOL OF KENTUCKY, INC.,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Plaintiffs' motion for partial summary judgment and for declaratory and injunctive relief and civil penalties (ECF No. 42) and Defendant's motion for summary judgment (ECF No. 44). For the reasons explained below, the Court **GRANTS in part** and **DENIES in part** Plaintiffs' motion for partial summary judgment and for declaratory and injunctive relief and civil penalties. Specifically, the Court **GRANTS** Plaintiffs' motion as to Defendant's liability for selenium violations but **DENIES as premature, without prejudice,** Plaintiffs' claims for declaratory and injunctive relief and civil penalties; those claims will be resolved in phase II of this litigation. The Court accordingly **DENIES** Defendant's motion for summary judgment, noting that it **DENIES as premature, without prejudice,** Defendant's arguments relating to Plaintiffs' claims for relief; arguments regarding mootness will be resolved

1

in phase II. The Court **DIRECTS** the parties to file a Rule 26(f) report regarding phase II of this litigation within **twenty-one (21) days** from the entry of this Memorandum Opinion and Order.

## I.      Background

Plaintiffs Ohio Valley Environmental Coalition, Inc. ("OVEC"), West Virginia Highlands Conservancy, Inc., and Sierra Club filed this case on March 13, 2013, pursuant to the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1251 et seq., and the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201 et seq. Plaintiffs allege that Defendant Consol of Kentucky, Inc., violated these statutes by discharging excessive amounts of selenium into the waters of West Virginia. Compl., ECF No. 1. Plaintiffs' Amended Complaint was filed on June 4, 2013. Am. Compl., ECF No. 19. Plaintiffs move for partial summary judgment, arguing that Defendant is liable under the CWA and the SMCRA for excessive selenium discharges from the Peg Fork Surface Mine. Defendant also moves for summary judgment, arguing that it is entitled to summary judgment in its favor on all of Plaintiffs' claims because 1) Plaintiffs have failed to establish standing and 2) Plaintiffs' claims are barred by the West Virginia Department of Environmental Protection's ("WVDEP") enforcement action against Defendant.

In Section II, the Court explains the legal standard applicable to motions for summary judgment. After discussing the relevant regulatory framework in Section III, the Court analyzes in Section IV whether Plaintiffs are barred from bringing this lawsuit because of the WVDEP's enforcement action. Plaintiffs' standing to pursue the relief sought is discussed in Section V. The Court examines Plaintiffs' provision of sixty days' notice and the Amended Complaint's good-faith allegations of continuous or intermittent violation of the CWA by Defendant in Sections VI

and VII, respectively. In Section VIII, the Court assesses Plaintiffs' evidence of Defendant's liability.

## II.     Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his [or her] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v.*

*United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he [or she] must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his [or her] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). Having discussed the standard for review of motions for summary judgment, the Court now turns to the regulatory framework underlying this lawsuit.

### III.     Regulatory Framework

A primary goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To further this goal, the CWA prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of a National Pollutant Discharge Elimination System ("NPDES") permit. *Id.* §§ 1311(a), 1342. Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or an authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. *Id.* § 1342. A state may receive approval to administer a state-run NPDES program pursuant to 33 U.S.C. § 1342(b). West Virginia received approval of its state-run NPDES program in 1982. 47 Fed. Reg. 22363-01 (May 24, 1982). The State's NPDES program is currently administered by the WVDEP.

All West Virginia coal mining NPDES permits incorporate by reference West Virginia Code of State Rules § 47-30-5.1.f, which states, in part, that "discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water

quality standards promulgated by [West Virginia Code of State Rules § 47-2]."[1] States are required by the CWA to adopt water quality standards in order to "protect the public health or welfare, [and] enhance the quality of water," and such water quality standards "shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." 33 U.S.C. § 1313(c)(2)(A). Each standard "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." *Id.*

West Virginia's water quality standards promulgated for the protection of aquatic life impose limitations on selenium. Specifically, selenium cannot exceed an acute limitation of 20 ug/l or a chronic limitation of 5 ug/l. W. Va. Code R. § 47-2, app. E, tbl.2, div. 8.27. The acute limitation is defined as a "[o]ne hour average concentration not to be exceeded more than once every three years on the average." *Id.* § 47-2-9 n.1. The chronic limitation is a "[f]our-day average concentration not to be exceeded more than once every three years on the average." *Id.* n.2.

In *OVEC v. Fola Coal Company, LLC*, this Court was asked to determine whether holders of WV/NPDES permits that incorporate § 47-30-5.1.f by reference—but which

---

[1]   Section 47-30-5.1.f states in its entirety: "The discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by 47 C.S.R. 2. Further, any activities covered under a WV/NPDES permit shall not lead to pollution of the groundwater of the State as a result of the disposal or discharge of such wastes covered herein. However, as provided by subdivision 3.4.a. of this rule, except for any toxic effluent standards and prohibitions imposed under CWA Section 307 for toxic pollutants injurious to human health, compliance with a permit during its term constitutes compliance for purposes of enforcement with CWA Sections 301, 302, 306, 307, 318, 403, and 405 and Article 11."

otherwise contain no specific limits on the discharge of selenium—are required to comply with the selenium limitations found in West Virginia's water quality standards. No. 2:12-cv-3750, 2013 WL 6709957, at *10-21 (S.D. W. Va. Dec. 19, 2013). The Court examined two permits held by Fola, neither of which identified selenium as a pollutant whose presence must be monitored or limited. Both permits, however, incorporated by reference the WV/NPDES Rules for Coal Mining and Facilities found in Title 47, Series 30, of the West Virginia Code, including § 47-30-5.1.f. The Court found that this incorporation by reference is in accordance with state rules, which require that the water quality standards rule found at § 47-30-5.1.f—among other rules—"be incorporated into the WV/NPDES permits either expressly or by reference." W. Va. Code R. § 47-30-5; *Fola*, 2013 WL 6709957, at *2. Relying in part on this Court's earlier decision in *OVEC v. Marfork Coal Company, Inc.*, No. 5:12-cv-1464, 2013 WL 4506175 (S.D. W. Va. Aug. 22, 2013), the Court held that § 47-30-5.1.f was an explicit and enforceable condition of Fola's WV/NPDES permits and that Fola would not be protected by the permit shield defense[2] if it violated this permit condition. *Fola*, 2013 WL 6709957, at *10-21; s*ee also OVEC v. Elk Run Coal Company, Inc.*, No. 3:12-cv-0785, 2014 WL 29562, at *3-10 (S.D. W. Va. Jan. 3, 2014) (relying in part on this Court's discussion of § 47-30-5.1.f in *Marfork* and *Fola*).

This case implicates Defendant's WV/NPDES Permit WV1023004, which regulates water pollution from Defendant's Peg Fork Surface Mine. WV/NPDES Permit WV1023004 incorporates by reference West Virginia Code of State Rules § 47-30-5.1.f. It is undisputed by the parties that this Court's holdings, as explained above, control the analysis of this permit

---

[2] Under the permit shield defense, a permit holder cannot be held liable for CWA violations if the permit holder is in compliance with the terms of its permit. *See* 33 U.S.C. § 1342(k).

provision. Therefore, Defendant may be held liable, through its permit, for selenium discharges that violate the acute limitation of 20 ug/l or the chronic limitation of 5 ug/l.

In addition to being subject to the CWA, coal mines are subject to regulation under the SMCRA, which prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or an authorized state agency. 30 U.S.C. §§ 1211, 1256, 1257. A state may receive approval to administer a state-run surface mining permit program pursuant to 30 U.S.C. § 1253. West Virginia received conditional approval of its state-run program in 1981. 46 Fed. Reg. 5915-01 (Jan. 21, 1981). West Virginia's surface mining permit program is administered by the WVDEP pursuant to the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"). W. Va. Code § 22-3-1 et seq. The surface mining permit associated with Defendant's Peg Fork Surface Mine is WVSCMRA Permit S501806.

Regulations passed pursuant to the WVSCMRA require permit holders to comply with the terms and conditions of their permits and all applicable performance standards. W. Va. Code R. § 38-2-3.33.c. One of these performance standards requires that "[d]ischarge from areas disturbed by surface mining shall not violate effluent limitations or cause a violation of applicable water quality standards." *Id.* § 38-2-14.5.b. Another performance standard mandates that "[a]dequate facilities shall be installed, operated and maintained using the best technology currently available . . . to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection." *Id.* § 38-2-14.5.c.

## IV.    Effect of the WVDEP's Enforcement Action Against Defendant

Plaintiffs are prohibited from bringing this citizen suit "if the Administrator or State has

commenced and is diligently prosecuting a civil or criminal action in a court of the United States[] or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right." 33 U.S.C § 1365(b)(1)(B) (CWA provision); *see also* 30 U.S.C. § 1270(b)(1)(B) (similar prohibition for SMCRA citizen suits). Defendant argues that Plaintiffs' lawsuit is barred by the WVDEP's diligent prosecution of Defendant regarding the permits at issue.

At this stage, the relevant inquiry is whether, at the time Plaintiffs filed their Complaint, the WVDEP had commenced and was diligently prosecuting an enforcement action against Defendant regarding the selenium limits at issue in this lawsuit. *See OVEC v. Hobet Mining, LLC*, 723 F. Supp. 2d 886, 907 (S.D. W. Va. 2010) ("Considering the context surrounding the WVDEP's state prosecution . . . , the Court finds that WVDEP was not diligent prior to Plaintiffs filing suit on October 23, 2009 . . . ."); *see also OVEC v. Maple Coal Co.*, 808 F. Supp. 2d 868, 883 (S.D. W. Va. 2011) ("First, a court must determine whether a prosecution by the state (or the EPA Administrator) to enforce the same 'standard, order, or limitation' was pending on the date that the citizens' suit commenced. Second, if the answer to the previous question is affirmative, a court must also determine whether the prior pending action was being 'diligently prosecuted' by the state at the time that the citizens' suit was filed."). The statutory prohibition should not be interpreted to mean that a plaintiff could simply wait until an enforcement action is *concluded* to file its own citizen suit:

> [R]eading [the statutory prohibition] only in the present tense would allow citizens to bring a private enforcement action against any alleged violator, as long as the citizen waited until the conclusion of the governmental action before bringing the citizen suit. Such a result would be contrary to the United States Supreme Court's declaration in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.,* 484 U.S. 49, 108 S. Ct. 376, 98 L.Ed.2d 306 (1987), that "citizen suits are

> proper only 'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.['"] *Id.* at 60, 108 S. Ct. at 383 (quoting S. Rep. No. 414, 92d Cong., 1st Sess. 64 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3730). Thus, although the "diligent prosecution" condition . . . is phrased in the present tense, the court has determined that Congress intended to prohibit citizen suits where the governmental enforcement agency is diligently prosecuting or has diligently prosecuted a judicial action to enforce the same alleged violations of a particular permit, standard, or limitation.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 890 F. Supp. 470, 485-86 (D.S.C. 1995) (footnote omitted).

With this framework in mind, the Court now turns to the details surrounding the WVDEP's enforcement action against Defendant. Defendant received notice of Plaintiffs' intent to sue on September 23, 2011. ECF No. 42-11 (letter providing notice to Defendant as to Outfall 002 of WV/NPDES Permit WV1023004). A few months later, in December 2011, the WVDEP commenced an enforcement action against Defendant in the Circuit Court of Mingo County, West Virginia, alleging violations of the West Virginia Water Pollution Control Act and the WVSCMRA in connection with eleven of Defendant's WV/NPDES permits and twenty-three of Defendant's surface mining permits. As originally filed, the enforcement action did not address Defendant's WV/NPDES Permit WV1023004. However, the surface mining permit associated with Defendant's Peg Fork Surface Mine, WVSCMRA Permit S501806, was part of the enforcement action from its inception, but only as it related to the other WV/NPDES permits.

On December 26, 2012,—several months before Plaintiffs filed their original Complaint in the instant case—a Consent Decree resolving the WVDEP enforcement action was entered, subject to a thirty-day notice and comment period. Consent Decree, ECF No. 44-2. In addition to resolving the enforcement action, the Consent Decree also purported to redress violations of Defendant's WV/NPDES Permit WV1023004:

The parties acknowledge that WVDEP's Complaint does not allege violations of permit WV1023004. For purposes of this Consent Decree, the parties acknowledge that WVDEP could amend its Complaint to include alleged violations of permit WV1023004, and agree to resolve potential violations of permit WV1023004 through this Consent Decree without WVDEP amending its Complaint.

*Id.* ¶ 3.

The Court finds that, at the time Plaintiffs filed their Complaint, the WVDEP had already commenced and completed an action to require compliance with both WV/NPDES Permit WV1023004 and WVSCMRA Permit S501806. Plaintiffs point out that the WVDEP enforcement action did not originally encompass WV/NPDES Permit WV1023004 and was never formally amended to encompass that permit. Based on *Laidlaw*, it is irrelevant to this analysis that the Consent Decree resolving the WVDEP's enforcement action against Defendant was entered before Plaintiffs filed their Complaint. The Court does not believe that lack of original inclusion or formal amendment prohibits a finding that the WVDEP had commenced an action regarding that permit at the time Plaintiffs filed their Complaint. As noted above, the Consent Decree purported to resolve violations regarding WV/NPDES Permit WV1023004, and that Consent Decree was entered several months before Plaintiffs filed their Complaint. *See Hobet*, 723 F. Supp. 2d at 906 ("[T]he WVDEP had arguably 'commenced' an enforcement action with regard to [the permit], prior to the filing of Plaintiffs' complaint on October 23, 2009, when the agency released the proposed modified consent order in the Boone County action for notice and comment."). Therefore, a state enforcement action involving this permit had already been commenced at the time that Plaintiffs filed their Complaint in this case.

Having determined that the WVDEP had commenced an enforcement action regarding WV/NPDES Permit WV1023004 when the Complaint in this action was filed, the Court next

considers whether the WVDEP was diligently prosecuting its enforcement action at that same moment in time. The Fourth Circuit has stated that "a CWA enforcement action will be considered diligent where it is capable of requiring compliance with the Act and is in good faith calculated to do so." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD*, 523 F.3d 453, 460 (4th Cir. 2008). The burden of proving a lack of diligent prosecution falls on Plaintiffs. *Id.* at 459. This is a high standard, and diligent prosecution is presumed. *Id.* The Fourth Circuit has further elaborated:

> Section 1365(b)(1)(B) does not require government prosecution to be far-reaching or zealous. It requires only diligence. Thus, a citizen-plaintiff cannot overcome the presumption of diligence merely by showing that the agency's prosecution strategy is less aggressive than he would like or that it did not produce a completely satisfactory result. Moreover, the fact that an agency has entered into a consent decree with a violator that establishes a prospective schedule of compliance does not necessarily establish lack of diligence.

*Id.* (citations omitted) (internal quotation marks omitted).

As this Court has discussed previously, the context of the enforcement action and the terms of the existing consent decree will be considered when determining whether there was diligent prosecution at the time Plaintiffs' lawsuit was filed. *See OVEC v. Patriot Coal Corp.*, No. 3:11-cv-0115, 2011 WL 6101921, at *5-7 (S.D. W. Va. Dec. 7, 2011) ("As in [*OVEC v. Hobet Mining, LLC*, No. 3:08-cv-0088, 2008 WL 5377799 (S.D. W. Va. Dec. 18, 2008),] and [*Hobet Mining, LLC*, 723 F. Supp. 2d 886], the Court looks to the entire context surrounding the WVDEP's prosecution of these permits."); *Maple Coal*, 808 F. Supp. 2d at 883-87 ("[A] diligent prosecution would have sought to enforce *something*. Instead, the relief sought is entirely prospective and nonspecific, and moves the status of the Maple permit and its associated selenium limits no where [sic] closer to a firm obligation." (emphasis in original)); *OVEC v. Independence Coal Co., Inc.*, No. 3:10-cv-0836, 2011 WL 1984523, at *3-7 (S.D. W. Va. May

-11-

20, 2011) (in ruling that a Consent Decree did not preclude the plaintiffs' citizen suit, finding that the fine imposed pursuant to the Consent Decree did not discourage selenium pollution and noting the WVDEP's delays in implementing the selenium limits); *Hobet*, 723 F. Supp. 2d at 906-08 (finding no diligent prosecution and discussing such considerations as the WVDEP's poor enforcement, the compliance deadline, and the penalty imposed).

The Consent Decree includes a table listing WV/NPDES permits held by Defendant for which exceedances of certain parameters occurred from December 1, 2008, through December 31, 2011; WV/NPDES Permit WV1023004 is not listed in this table. Consent Decree ¶ 10. The Consent Decree then states that "the exceedances identified above have not been of a chronic nature, or have already been addressed through corrective action, and the parties agree that, as of the effective date of this Consent Decree, no compliance plan for these parameters is warranted." *Id.* ¶ 12. Moving on to discussion of the permits underlying Plaintiffs' lawsuit, the Consent Decree states that water samples from the area covered by WV/NPDES Permit WV1023004 and WVSCMRA Permit S501806 "indicate that in-stream concentrations of selenium exceeded the chronic selenium water quality standard . . . at certain sampling stations downstream of mining operations between March 2011 and February 2012." *Id.* ¶ 13. Later, the Consent Decree specifies that "[Defendant] shall . . . implement the corrective action plan attached as Exhibit A," which relates specifically and only to WV/NPDES Permit WV1023004 and WVSCMRA Permit S501806. *Id.* ¶ 20.

The Consent Decree specifies that Defendant will pay a civil penalty of $295,250 "in settlement of the WVDEP's claims in its Complaint relating to alleged violations of the . . . NPDES Permits from December 1, 2008 through December 31, 2011." *Id.* ¶ 21. Based on the

timeframe specified and the reference to the enforcement action's complaint, it is clear that this civil penalty is meant to address violations of the WV/NPDES permits listed in the table—*not* WV/NPDES Permit WV1023004. The Consent Decree also provides for stipulated penalties for each violation of daily maximum limits or average monthly limits from January 1, 2012, through the entry of the Consent Decree. *Id.* ¶ 22. However, daily maximum limits and average monthly limits are not specified in WV/NPDES Permit WV1023004, making those penalties also inapplicable to this permit. In essence, the Consent Decree resolves possible violations of selenium limits under WV/NPDES Permit WV1023004, yet imposes no monetary penalty on Defendant for violations of that particular permit, even though monetary penalties are imposed in connection with resolution of alleged violations of the other permits. The Consent Decree impermissibly singles out this permit for different treatment compared to the other permits. Because no monetary penalties are imposed for this particular permit, the Consent Decree does not sufficiently incentivize Defendant's compliance with selenium limits under this permit.

Exhibit A of the Consent Decree specifies the "corrective action plan" for WV/NPDES Permit WV1023004 and WVSCMRA Permit S501806. *Id.*, Ex. A. It provides that, within thirty days of the entry of the Consent Decree, Defendant is required to "submit an application for either reissuance or modification of [this WV/NPDES permit] to . . . assign selenium effluent limits and set forth a schedule of compliance whereby [Defendant] shall implement measures to ensure compliance with selenium limits at Outlet[] . . . 002." *Id.*, Ex. A ¶ 1.

The Court notes that the inquiry into diligent prosecution is distinct from whether the WVDEP's enforcement actions have mooted Plaintiffs' claims for relief, which entails inquiry into whether there is a realistic prospect that violations will continue in the future:

-13-

> [T]he diligent prosecution (preclusion) and realistic prospect (mootness) standards apply at different junctures in a citizen suit. The diligent prosecution standard bars a citizen action if the citizen-plaintiff seeks to file suit *after* a governmental enforcement action has been commenced. To avoid preclusion, the citizen-plaintiff must prove that the prior-filed government action is not diligent. The realistic prospect standard, on the other hand, applies if government enforcement action is taken *after* a citizen suit is filed. It is used to determine whether the prior-filed citizen suit can proceed in light of the subsequent government activity.

*Hobet*, 723 F.Supp.2d at 905 (citations omitted). Defendant applied for reissuance or modification of its permit as required by the Consent Decree, and the WVDEP reissued the permit on March 31, 2014. WV/NPDES Permit WV1023004, ECF No. 78. Because the relevant inquiry is whether there was diligent prosecution *at the time* that Plaintiffs filed their Complaint, the reissuance of Defendant's permit will not be considered at this stage, although it may be considered later on the issue of whether Plaintiffs' claims for relief are moot.

The Court notes that the Consent Decree and its Exhibit A provide no outside limits on what Defendant should have proposed when applying for reissuance or modification of its permit; essentially, Defendant was free to suggest whatever changes—no matter how insubstantial or delayed—it preferred. The Consent Decree provided no timeline for compliance to correct selenium violations. Furthermore, the WVDEP has the authority under state law to modify any permit at any time, regardless of whether the permit holder has requested modification or reissuance of the permit. W. Va. Code R. § 47-30-8.1.a ("WV/NPDES permits may be modified, reissued, suspended, released or revoked either at the request of any interested person (including the permittee) or upon the Secretary's initiative."). Because the WVDEP has had the power to modify WV/NPDES Permit WV1023004 all along, the Consent Decree does not have any effect on the permit beyond what was already permissible under state law.

-14-

Lastly, the Court considers Plaintiffs' opportunity for involvement in the enforcement action. At the time it commenced its enforcement action, the WVDEP had knowledge of the alleged violations underlying Plaintiffs' lawsuit, yet it did not initially include WV/NPDES Permit WV1023004 in the enforcement action. To the Court's knowledge, the permit was not publicly implicated in the enforcement action until the Consent Decree was entered on December 26, 2012. However, the Consent Decree allowed time for public comment concerning its terms:

> The parties acknowledge and agree that final approval of this Consent Decree is subject to public notice and comment as provided in 47 C.S.R. § 30-15.2.c. . . . The public shall have at least thirty (30) days in which to make any comments on this Consent Decree and the WVDEP reserves the right to withhold or withdraw its consent or propose modifications to this Consent Decree if warranted based on the comments received during the period for public comments.

Consent Decree ¶ 29. Plaintiffs apparently did not provide any comment about the Consent Decree during the time allotted for public comment. Although Plaintiffs should have formalized their opposition to the Consent Decree during the public comment period, their failure to do so is a reflection of the manner in which WV/NPDES Permit WV1023004 was added to the WVDEP's enforcement action after that action had substantially progressed. It appears to the Court that the permit was added to the Consent Decree because of a deal struck between Defendant and the WVDEP, the timing of which made it unlikely that Plaintiffs could effectively intervene.

The Court will consider the Consent Decree and the reissued permit in phase II of this litigation when discussing whether Plaintiffs' claims for relief are moot. At this stage, however, given the overall context of how WV/NPDES Permit WV1023004 was added to the enforcement action and the terms of the Consent Decree, the Court finds that the WVDEP's enforcement action regarding the two permits at issue in this case does not constitute "diligent prosecution" as

that term is used by the CWA and the SMCRA. The enforcement action, therefore, is not a bar to Plaintiffs' lawsuit.

## V.  Standing

### A.  *Legal Standard*

In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to make it justiciable under Article III of the Constitution. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper I*"), 204 F.3d 149, 153 (4th Cir. 2000); *see also* U.S. Const. art. III (restricting federal courts to adjudicating "cases" and "controversies"). In order to satisfy the minimum constitutional requirements for standing, an individual plaintiff must demonstrate:

> (1) [he or she] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In environmental cases, "a plaintiff need only show that he [or she] used the affected area, and that he [or she] is an individual 'for whom the aesthetic and recreational values of the area [are] lessened' by the defendant's activity." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD*, 268 F.3d 255, 263 (4th Cir. 2001) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)). Furthermore, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181.

-16-

As this Court explained in *OVEC v. Maple Coal Company*, a court is not required to determine the merits of the environmental violations alleged when deciding if standing exists. 808 F. Supp. 2d at 882 (citing *Laidlaw*, 528 U.S. at 181). "What [standing] does require is a demonstration that if the allegations of Clean Water Act violations are true, the impacts of the alleged violations are felt in an area with which the plaintiffs have 'a direct nexus.'" *Id.* (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper II*"), 629 F.3d 387, 395 (4th Cir. 2011)). A plaintiff "may rely on circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability." *Gaston Copper I*, 204 F.3d at 163. To require more would contravene the otherwise "straightforward Clean Water Act issue of whether [the defendant] has violated its permit limitations," thereby "throw[ing] federal legislative efforts to control water pollution into a time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements." *Id.* at 163-64.

When the plaintiff in question is an organization, that organization "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

### B. The Boundaries of the Affected Area

Before determining whether standing is met, the Court must determine the boundaries of the area affected by Defendant's discharges. The Peg Fork Surface Mine discharges into an

unnamed tributary of Mill Fork, which is a tributary of Miller Creek. Miller Creek in turn flows into Tug Fork. Plaintiffs represent that the confluence of Miller Creek and Tug Fork is located approximately 3.49 miles from Outfall 002, which is regulated by the WV/NPDES permit at issue in this case. Pls.' Mem. Opp'n Def.'s Mot. Summ. J. 3, ECF No. 62; Emily Russell Decl. ¶ 6 & App. A, ECF No. 62-1.

Although there is some ambiguity about what the precise distance is[3]—therefore opening the door to the possibility that the actual distance from Outfall 002 to the confluence could be greater than 3.49 miles—the Court has no problem finding that the area between Outfall 002 and Miller Creek's confluence with Tug Fork is an affected area. The WVDEP's Cumulative Hydrologic Impact Assessment of Miller Creek discusses the effects of the Peg Fork Surface Mine, stating, "The surface and groundwater Cumulative Impact Area (CIA) is the Miller Creek watershed." Assessment at 2, ECF No. 62-4. The Supreme Court has found standing where the distance between the facility creating the discharges and the point of use by an individual was much greater than the likely distance between the outfall and confluence in this case. *Laidlaw*, 528 U.S. at 183 (involving a distance of 40 miles); *Gaston Copper II*, 629 F.3d at 395 (involving a distance of 16.5 miles). Although *Laidlaw* and *Gaston Copper II* did not explicitly involve selenium, they are instructive here in determining what distance is reasonable for the purpose of assessing standing. *See also Fola*, 2013 WL 6709957, at *7 (citing these two Supreme Court cases in the discussion of what constitutes an "affected area" and finding that the area affected by selenium discharge stretched approximately six miles, at the least, from the outfalls at issue).

---

[3] Ms. Russel states that the distance between *the NPDES monitoring point* and the confluence is 3.49 stream miles, Russel Decl. ¶ 6, but a notation on the map attached to the declaration states that the distance from *Outfall 002* to the confluence is 3.49 miles, *id.*, App. A.

Therefore, the entirety of Miller Creek is an affected area for the purposes of this case.

These cases and the available evidence likewise suggest that Tug Fork—from its confluence with Miller Creek to some point downstream—is also an affected area. *See* Pls.' Mem. Opp'n Def.'s Mot. Summ. J. 4. ("[B]ecause of the hydrologic connection between Miller Creek and the Tug Fork, selenium effects on the chemical and biological integrity of Miller Creek will impact the Tug Fork for at least a short distance."). Determining the exact length of the affected area of Tug Fork is unnecessary. In summary, all of Miller Creek is an affected area for the purposes of this lawsuit, as is Tug Fork from its confluence with Miller Creek to some point downstream.

### C. *Donna Branham's Use of the Affected Area*

Plaintiffs assert standing through Donna Branham. *See* Donna Branham Decl., ECF No. 42-8; Donna Branham Dep., ECF No. 42-9. Ms. Branham is a member of all three plaintiff organizations. Branham Decl. ¶¶ 2-4. Ms. Branham grew up in the Tug Fork watershed, playing in the creek and traveling "up the hollow to get drinking water." *Id.* ¶ 5. She visited Miller Creek many times per year with her husband while they were dating and after they were married; during their visits, they picnicked along the water, fished, and enjoyed the water's beauty. *Id.* ¶¶ 12-13. Ms. Branham "drive[s] by the mouth of Miller Creek frequently during [her] routine activities." *Id.* ¶ 14. During the drives, she "think[s] about what a beautiful place Miller Creek was and the good times [she] had there with [her] husband." *Id.* During a visit to Miller Creek in August 2011, she tested the water's conductivity. *Id.* ¶ 15. She took part in this testing trip because she was "curious about what was running into the Tug River and what was in the water." Branham Dep. 45. She was "aesthetically offended" during that trip and "refrained from wading

in the stream" because of selenium pollution. Branham Decl. ¶¶ 16-17. Ms. Branham states that she is "greatly saddened and disheartened" by mining pollution in the Tug Fork watershed and she is angry that her grandchildren cannot enjoy nature like she did. *Id.* ¶¶ 6-7. She is specifically troubled by selenium pollution. *Id.* ¶¶ 10-11.

Defendant argues that Ms. Branham's connection to the area is insufficient to confer standing. Defendant points out—and Plaintiffs do not dispute—that Ms. Branham stopped visiting Miller Creek around 1986. Since then, she has only returned to Miller Creek once, for the August 2011 inspection. Ms. Branham states that she drives by Miller Creek frequently, but Defendant points out that Ms. Branham is unable to actually see the water when she makes these drives. Defendant argues that Ms. Branham has not demonstrated a sufficient intent to visit the affected area in the future. Additionally, according to Defendant, Ms. Branham does not have any injury stemming from her use of any publicly accessible area.

Plaintiffs' allegations regarding standing challenge the boundaries of the standing analysis. Plaintiffs rely on just one individual to confer standing, rather than the two or more individuals used for each affected area in other cases brought by these same Plaintiffs. Even more importantly, Ms. Branham's connection to the affected area is more attenuated temporally than in other cases. Although she has a very strong connection to the affected area from childhood until around 1986, her connection is much weaker after that time.

This Court, in the past, has given some weight to aesthetic or recreational activities in which an individual partakes while conducting a scientific inspection of a given water body. *See Fola*, 2013 WL 6709957, at *9 ("[A]lthough the inspection itself is not considered for standing purposes, the part of the visit that day that went beyond the scope of the inspection *does* weigh

into the standing analysis." (emphasis in original)). However, the Court gives little, if any, weight to Ms. Branham's August 2011 visit to Miller Creek to test the water's conductivity. Although the results of this testing were not used in the present lawsuit (and will not necessarily be used in any lawsuit), it is clear that the possible litigation purposes of that visit predominated. It is also questionable whether Ms. Brandham attempted any aesthetic or recreational enjoyment of the creek that day. *See* Branham Decl. ¶ 17 ("I refrained from wading in the stream because I was concerned about the polluted water laden with selenium . . . .").

Although the August 2011 inspection is given little or no weight, the Court gives great weight to Ms. Branham's history of strong connection to the area. *Cf. Maple Coal*, 808 F. Supp. 2d at 880 (finding that standing was not met where members had no connection to the affected area prior to visiting for water monitoring trips and "conclud[ing] that the sole purpose of the water monitoring trips was to manufacture standing"). The Court also gives some weight to Ms. Branham's frequent drives by the area, during which she thinks about Miller Creek.

Turning to the issue of alleged intent to return to the affected area, other courts suggest that an individual's plans to visit an affected area in the future should be considered in conjunction with their ability to actually carry out those visits:

> [A] careful consideration of [other cases] reveals that [those cases] reflect two ends of a common spectrum. Where a party demonstrates repeated past usage of the affected area, either by his proximity to the affected area or repeated, habitual, even if infrequent, visits, the likelihood that he will return is readily established by reference to his plans to continue past usage. A party need not demonstrate "concrete plans" to return. In contrast, where a party does not live in the immediate vicinity of the affected area and has only demonstrated a sporadic history of past visits, he must establish his intention to return with more specificity.

*WildEarth Guardians v. Salazar*, 834 F. Supp. 2d 1220, 1226 (D. Colo. 2011) (citation omitted).

The Court notes that Ms. Branham states that she "will continue visiting Miller Creek . . . in the

future" and that "[i]f [Defendant] were to stop its illegal discharges of selenium into the headwaters of Mill Fork and Millers [sic] Creek, then [she] would enjoy [her] visits to those streams more." Branham Decl. ¶¶ 18, 20. During her deposition, when Ms. Branham was asked, "Do you intend to take your grandson to Millers [sic] Creek in the spring or summer or in the next 12 months?," she responded, "Yes, if at all possible." Branham Dep. 88. Ms. Branham also noted that her family is not able to enjoy picnicking and picking berries along the stream as she used to do, and she would not want her family going into the waters. *Id.* 66-67.

It is clear from the deposition as a whole that Ms. Branham laments the damage that has occurred to the area that she used to love visiting and that she would visit there recreationally if not for the selenium pollution in the streams. This assertion is bolstered by the fact that she still lives in the area and would easily be able to visit again if conditions changed. Additionally, she thinks about the waters when she drives by the confluence of Miller Creek and Tug Fork, which bolsters her connection to the affected area. Given that she considers the affected area no longer pleasant to enjoy because the waters are no longer clean, it makes sense that Ms. Branham has not visited the area for recreational purposes like she did in years past. Based on these considerations and the "spectrum" laid out in *WildEarth*, Ms. Branham has sufficiently alleged her intent to return to the affected area. Based on Ms. Branham's strong past connection to the affected area, her continuing concern for selenium pollution caused by mining in the affected area, and her interest in returning to the area, the Court finds that Plaintiffs' standing is sufficiently alleged through Ms. Branham.

Defendant additionally argues that Ms. Branham no longer has access to the affected area and, therefore, she has not suffered an injury sufficient to confer standing. The declaration of a

Cotiga Development Company[4] employee states, "All of the streams in the Miller Creek drainage that accept flow from the Peg Fork Surface Mine are on and are surrounded by surface property owned by Cotiga. This includes every section of Mill Fork and Miller Creek that receive water discharged from Outlet 002—no section of those streams can be accessed without crossing Cotiga surface property." Edward L. Curry Decl. ¶ 5, ECF No. 46-1.  Further, "Cotiga has not granted Donna Branham any right of access to or across its property in the Miller Creek or other watersheds." *Id.* ¶ 6.

Plaintiffs argue that Mr. Curry's declaration cannot be considered because Defendant did not properly identify Mr. Curry as a potential witness. They additionally argue that Defendant cannot complain about trespass onto land which it does not own or possess. The Court need not resolve these arguments because, even assuming that Mr. Curry's declaration and the arguments regarding public access can properly be considered, Defendant's arguments about Ms. Branham's ability to access certain affected areas do not preclude standing. Even if Ms. Branham were not able to return to Miller Creek—although the Court notes that she may be able to access *some* portion of it—, the evidence suggests that she can access some portion of Tug Fork affected by Defendant's selenium discharges. For example, Ms. Branham testified that she believed she could publicly access the confluence of Miller Creek and Tug Fork. Branham Dep. 88-89. She drives near the confluence of Miller Creek and Tug Fork frequently, and although she might not be able to see the water during these drives, she nonetheless thinks about the waters when she is driving near that point.

---

[4] Cotiga holds surface and mineral rights in the Miller Creek watershed and Defendant leases such rights from Cotiga for the operation of Defendant's Peg Fork Surface Mine. Edward L. Curry Decl. ¶ 1, ECF No. 46-1.

Defendant suggests that such access to Tug Fork is irrelevant because Ms. Branham's concerns about Tug Fork are "generalized grievances, not particularized injuries connected to any use she makes of Tug Fork." Def.'s Reply Def.'s Mot. Summ. J. 4; ECF No. 65. Ms. Branham stated in her deposition that she did not believe selenium in Mill Fork was causing excessive selenium levels in Tug Fork. Branham Dep. 78.[5] However, that statement does not negate her overall concern for the impact of selenium pollution on Tug Fork, as reflected in other statements she has made. *See, e.g.*, Branham Decl. ¶¶ 6, 10 (stating "I am greatly saddened and disheartened by the pollution caused by the mining operations in the Tug Fork watershed," and discussing her anger about selenium pollution); Branham Dep. 77 (explaining her "major concern" for "the lack of aquatic life and the selenium that's in the water that's being discharged . . . into Tug Fork"). It is clear that Ms. Branham has an ongoing concern for the effects of selenium pollution in Miller Creek *and Tug Fork* and that she can access at least some portions of the affected area. Additionally, her intention to return to whatever portion of the watershed that she can access is inferred from the whole of her testimony and from her declaration. It is clear that Ms. Branham has a particularized injury in relation to both Miller Creek and Tug Fork, including the confluence.

Additionally, even if Ms. Branham were not able to access any of the affected area, it is not necessarily true that the lack of access would foreclose standing. *See Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001) ("[W]e have never required a plaintiff to show that he has a right of access to the site on which the challenged activity is occurring, or that he has an absolute right to enjoy the aesthetic or recreational activities that form the basis of his concrete

---

[5] "Q. [I]s it your belief that whatever selenium level may be in Mill Fork is somehow causing an exceedance in the Tug Fork? A. No . . . ." Branham Dep. 78.

interest. If an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact."); *Soda Mountain Wilderness Council v. Norton*, 424 F. Supp. 2d 1241, 1256 (E.D. Cal. 2006) ("The plaintiffs have standing because the proposed action may affect the manner in which the private lands are managed in the future, a cognizable interest despite the plaintiffs lack of a right to access to the land. The declarations submitted by plaintiffs demonstrate that at least some of the organizations' members regularly travel to the edges of the public property.").

The other elements of Plaintiffs' standing through Ms. Branham are met. In summary, constitutional standing is met for all three plaintiff organizations. Again, while Ms. Branham's connection to this area strains the limits of the standing analysis, the Court finds that the allegations are nonetheless sufficient to confer standing.

## VI.     Sixty Days' Notice

Under the CWA and the SMCRA, no citizen suit may be commenced prior to the provision of sixty days' notice to the alleged violator, the Administrator of the EPA (for CWA citizen suits) or the Secretary of the Department of the Interior (for SMCRA citizen suits), and the State in which the alleged violation occurs. 30 U.S.C. § 1270(b)(1)(A); 33 U.S.C. § 1365(b)(1)(A).  Plaintiffs sent a letter to the appropriate recipients which provided the necessary details for valid notice of suit on September 23, 2011. *See* ECF No. 42-11. This lawsuit was commenced over sixty days later, on March 13, 2013. Defendant concedes that Plaintiffs meet the sixty days' notice requirement. Def.'s Resp. Pls.' First Req. Admiss., Req. No. 1, ECF No. 42-10 (discussing the letter). The Court finds that the sixty days' notice requirement is met.

## VII.    Good-Faith Allegation of Continuous or Intermittent Violation

-25-

As explained above, Plaintiffs bring their claims under the citizen suit provisions of the CWA and the SMCRA. The CWA's citizen suit provision states,

> [A]ny citizen may commence a civil action on his own behalf . . . (1) against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . .

33 U.S.C. § 1365(a). The SMCRA's citizen suit provision states,

> [A]ny person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter . . . against any other person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to this subchapter . . . .

30 U.S.C. § 1270(a). The Supreme Court has interpreted the phrase "alleged to be in violation"—which appears in both the CWA and the SMCRA provisions above—to require "that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.* ("*Gwaltney III*"), 484 U.S. 49, 57 (1987).[6]

"[A] good-faith allegation [of continuous or intermittent violation] . . . suffice[s] for jurisdictional purposes . . . ." *Id.* at 65. The issue of what evidence must be shown for jurisdictional purposes is distinct from what evidence must be shown for a defendant to ultimately be held liable for violations of the CWA and the SMCRA. *See Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.* ("*Gwaltney IV*"), 844 F.2d 170, 171 (4th Cir. 1988)

---

[6] The *Gwaltney* line of cases is highly instructive for the Court's deliberations here. For the purposes of this case, it is useful for the Court to refer to several of the cases in this line: 1) the district court's original decision, 611 F. Supp. 1542 (E.D. Va. 1985) ("*Gwaltney I*"); 2) the Fourth Circuit's affirmance, 791 F.2d 304 (4th Cir. 1986) ("*Gwaltney II*"); 3) the Supreme Court's decision on appeal from the Fourth Circuit, 484 U.S. 49 (1987) ("*Gwaltney III* "); and 4) the Fourth Circuit's decision on remand from the Supreme Court, 844 F.2d 170 (4th Cir. 1988) ("*Gwaltney IV*").

(on remand from the Supreme Court, drawing a distinction between "a good faith allegation of ongoing violation sufficient to maintain jurisdiction" and "prov[ing] [an] allegation of continuous or intermittent violations, as required in order to prevail"). The Supreme Court specifically rejected the proposition that "citizen-plaintiffs must prove their allegations of ongoing noncompliance before jurisdiction attaches." *Gwaltney III*, 484 U.S. at 64. Good-faith allegations, not definitive proof, suffice for jurisdictional purposes. *Id.* at 65. To meet the jurisdictional requirements, Plaintiffs must merely show that, at the time they filed suit, they had a good-faith belief that Defendant was in continuous or intermittent violation of the CWA and the SMCRA. In a jurisdictional sense, then, this good-faith belief is an element of each of Plaintiffs' claims.

Accordingly, the Court must consider what constitutes a sufficient good-faith belief for jurisdictional purposes. In the district court case which eventually gave rise to the Supreme Court's *Gwaltney II* decision, the Eastern District of Virginia considered this question:

> A useful analogy [for understanding good-faith belief] is the manner in which the federal courts treat the jurisdictional amount requirement in diversity cases. . . .
>
> In diversity cases, the question whether the jurisdictional amount is satisfied—and whether the court, ultimately, has jurisdiction—is not answered by whether the plaintiff ultimately recovers in excess of $10,000. Rather, the issue is whether the amount plaintiff *stated in the original claim* satisfies the amount, and is made in good faith. . . . [T]he test of good faith is whether it appears to be a "legal certainty" that the jurisdictional fact is not satisfied.

*Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.* ("*Gwaltney I*"), 611 F. Supp. 1542, 1549 n.8 (E.D. Va. 1985) (emphasis in original) (citations omitted), *aff'd*, 791 F.2d 304 (4th Cir. 1986) ("*Gwaltney II*"), *vacated on different grounds in Gwaltney III,* 484 U.S. 49. In *Gwantley I*, the district court found that "there was no certainty . . . —legal, factual, or otherwise—that [the

defendant's] system would correct one of the two major violation problems for which this suit was brought—until nearly one year after the suit was filed." *Id.* In view of that finding, that district court ruled that the *Gwantley I* plaintiffs had sufficiently pled a violation in good faith.

In the instant case, Plaintiffs' Amended Complaint includes Appendix A, which is a table of selenium monitoring results from Peg Fork Surface Mine's Pond 2 and from downstream of Pond 2. Am. Compl., App. A, ECF No. 19-1. These measurements are taken from reports submitted by Defendant pursuant to the terms of its permit. The table presents measurements from March 8, 2011, through February 21, 2013. While some months have two days of measurements per location, other months have only one day. None of the measurements exceed 20 ug/l, *see id.* (showing maximum measurement of 13.60 ug/l), and therefore none of the measurements could be considered acute violations. Plaintiffs assert that these "selenium concentrations . . . exceeded the chronic selenium water quality standard." Am. Compl. ¶ 47. Although every measurement reported exceeds 5 ug/l, it is not clear that any of these measurements are actually *chronic* measurements, that is, four-day average concentrations. Even though "each violation of a *monthly average limitation* [is] equivalent to a daily violation for each day of that month," *Gwaltney II*, 791 F.2d at 313 (emphasis added), that proposition does not necessarily mean that one or two isolated measurements in a given month can be imputed to every day of the month for the purposes of calculating the *chronic concentration*. To do so would ignore the distinction between monthly average limitations and chronic limitations.

In arguing for summary judgment, Plaintiffs include the results from additional monitoring conducted in March and June 2013. *See* ECF No. 42-5 (table showing selenium measurements). First, it is not clear that the Court could even consider this data; the relevant

inquiry is what information was known to Plaintiffs *at the time they filed the Amended Complaint*, and the Amended Complaint fails to mention this additional information. Second, even to the extent that these results could be considered by the Court, they do little to bolster Plaintiffs' claims because, like the measurements above, they are isolated measurements that exceed 5 ug/l but do not reach 20 ug/l, rather than chronic concentrations.

Defendant argues that Plaintiffs cannot prove any pre-Complaint[7] selenium violations, and that therefore, Plaintiffs cannot succeed in proving liability. As this Court explained above, as well as in *Fola*, 2013 WL 6709957, at *22-25, and *OVEC v. Alex Energy*, No. 2:12-cv-3412, 2014 WL 1329919, at *12-14 (S.D. W. Va. Mar. 31, 2014), the evidence required in order to establish liability for selenium violations is distinct from the allegations which suffice for jurisdictional purposes. Therefore, Defendant's argument is rejected in the context of deciding whether Plaintiffs have sufficiently alleged in good faith an ongoing or intermittent violation in their Amended Complaint.

Although the pre-Complaint evidence presented may not show conclusively either chronic or acute violations, it does show consistent measurements above 5 ug/l, and as high as 13.60 ug/l. Plaintiffs also allege "the absence of any evidence that any of [Defendant]'s efforts to eradicate the cause of the violations have been effective." Am. Compl. ¶ 48. Plaintiffs' letter providing notice to Defendant of their intent to sue requested that Defendant inform Plaintiffs of "any steps [taken by Defendant] to eradicate the underlying cause of the violations identified . . . , or if [Defendant] believes that anything in this letter is inaccurate." ECF No. 42-11 at 9. Defendant's counsel responded in a letter dated November 22, 2011, briefly describing Defendant's

---

[7] In this Memorandum Opinion and Order, "pre-Complaint" refers to the time before the *Amended* Complaint was filed.

conservation efforts and stating that "[Defendant] believes these actions will abate the impact, if any, of [Defendant]'s operations on the in-stream concentration of selenium." ECF No. 42-12 at 3. Defendant's response letter does not constitute an admission regarding the sufficiency of the selenium violations alleged. *See id.* at 1 n.1 ("Please note that nothing in this response letter is intended to waive or in any way limit the defenses and objections that [Defendant] may present or interpose in response to any legal action that may be brought against it based on the alleged claims or violations described in the [Notice of Intent]."). However, neither does it negate Plaintiffs' allegations of ongoing or intermittent violation. In light of the evidence presented, it does not "appear[] to be a 'legal certainty' that the jurisdictional fact is not satisfied." *Gwaltney I*, 611 F. Supp. at 1549 n.8.

Defendant additionally argues that Plaintiffs cannot prove that discharges from Outfall 002 caused any pre-Complaint exceedance of the selenium limit. In support of this argument, Defendant points out that the selenium measurements at monitoring point PF8 consistently exceeded those at PF9, even though PF8 is downstream from PF9. Even in this face of this suggestion about causation, because it is not a "legal certainty" that jurisdiction does not attach, the Court rejects this argument.

In summary, the Court finds that Plaintiffs' Amended Complaint sufficiently alleges, in good faith, an ongoing or intermittent violation by Defendant of the selenium limits found in West Virginia's water quality standards.[8]

## VIII.  Liability

---

[8] Having so found, the Court need not address Plaintiffs' arguments regarding computation of a chronic measurement using less than four days' data.

The Court next considers whether Defendant is liable for violating West Virginia's water quality standards. CWA liability can be established in two ways:

> Citizen-plaintiffs may [prove an ongoing violation] either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.

*Gwaltney IV,* 844 F.2d at 171-72; *see also Alex Energy*, 2014 WL 1329919, at *14; *Fola*, 2013 WL 6709957, at *24. Plaintiffs are not required to establish pre-Complaint violations in order to prevail, and neither are Plaintiffs required to prove the pre-Complaint violations alleged as a basis for jurisdiction in the Amended Complaint. *Alex Energy*, 2014 WL 1329919, at *14; *Fola*, 2013 WL 6709957, at *24-25.

Defendant argues that "this Court's holding in *Fola* [is] based on a misapplication of the first prong of the *Gwaltney [IV]* test." Def.'s Mem. Resp. Pls.' Mot. Partial Summ. J. 17, ECF No. 63. In support of this argument, Defendant points to cases where the defendants did not dispute the existence of pre-complaint violations and the court ultimately found the defendants liable for violations. *See, e.g, Hobet*, 723 F. Supp. 2d 886. While the more common scenario may be that the parties in a given environmental case do not dispute the existence of at least one pre-complaint violation, the Court need not revisit its finding from *Fola* based upon this pattern. As outlined above, a plaintiff need not ultimately *prove* a pre-complaint violation in order to prevail. This finding accords with the forward-looking nature of citizen suits. *Gwaltney III*, 484 U.S. at 59 ("[T]he harm sought to be addressed by the citizen suit lies in the present or the future, not in the past . . . ."). Therefore, Defendant's argument regarding Plaintiffs' inability to prove pre-Complaint violations is rejected.

To support their claim that Defendant is in continuing violation of the CWA, Plaintiffs point to measurements from Defendant's own monitoring, conducted from March 2011 to June 2013. *See* ECF No. 42-5 (table presenting measurements). None of the measurements exceed 20 ug/l; therefore the measurements cannot be considered violations of the acute limitation. Additionally, none of the measurements appear to be chronic measurements, that is, measurements representing a four-day average. Therefore, this evidence does not establish a violation of West Virginia's water quality standards.

Plaintiffs also present evidence from an inspection conducted in December 2013 pursuant to Federal Rule of Civil Procedure 34. Meghan Betcher Decl., ECF No. 42-6 (describing the sampling); ECF No. 42-7 (table presenting measurements from December 2013); ECF No. 67-3 (updated version of that table). During this inspection, water samples were collected from several locations, including Outfall 002, instream from Outfall 002, monitoring station PF8, and monitoring station PF9. Samples were collected each day from December 9 to December 14, 2013. The measurements from the Outfall 002 samples result in chronic selenium concentrations of 9.65 ug/l, 11.05 ug/l, and 10.825 ug/l. *See* ECF No. 67-3. The instream samples were taken from just below Outfall 002, and the measurements from the instream samples result in chronic selenium concentrations that are only slightly less than those from the Outfall 002 samples for each corresponding four-day period. *See id.* (showing chronic concentrations of 9.35 ug/l, 10.3 ug/l, and 10.175 ug/l). The similarities between the measurements resulting from the Outfall 002 samples and the instream samples sufficiently show that discharges from Outfall 002 are causing or materially contributing to selenium concentrations in that area. The Court need not make any finding as to the measurements from PF8 and PF9. Defendant does not dispute the results of this

sampling. Based on this evidence, Plaintiffs present post-Complaint evidence sufficient to establish at least one violation of West Virginia's water quality standards.

## IX.     Conclusion

For the reasons explained above, the Court **GRANTS in part** and **DENIES in part** Plaintiffs' motion for partial summary judgment and for declaratory and injunctive relief and civil penalties. Specifically, the Court **GRANTS** Plaintiffs' motion as to Defendant's liability for selenium violations, but **DENIES as premature, without prejudice,** Plaintiffs' claims for declaratory and injunctive relief and civil penalties; those claims will be resolved in phase II of this litigation. The Court accordingly **DENIES** Defendant's motion for summary judgment, noting that it **DENIES as premature, without prejudice,** Defendant's arguments relating to Plaintiffs' claims for relief; arguments regarding mootness will be resolved in phase II. The Court **DIRECTS** the parties to file a Rule 26(f) report regarding phase II of this litigation within **twenty-one (21) days** from the entry of this Memorandum Opinion and Order.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: April 30, 2014

ROBERT C. CHAMBERS, CHIEF JUDGE

-33-